# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

PHILLIP KARALI and GREGORY
SHELLEY, on behalf of themselves
and all others similarly situated,

      Plaintiffs,

      v.

BRANCH BANKING AND TRUST
COMPANY; DOES 1-10,
INCLUSIVE,

      Defendants.

:  Civil No. 3:16-cv-02093-BDM-TJB
:
:
:
:  Judge Brian D. Martinotti
:
:  Magistrate Judge Tonianne J.
:      Bongiovanni
:
:  **Motion Day: March 19, 2018**
:
:  Document Electronically Filed
:
:

---

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT
## (February 23, 2018)

---

Respectfully submitted,

/s/*Lindsey E. Snavely*
Lindsey E. Snavely, Esquire
**PILLAR AUGHT LLC**
Attorney I.D. No. 001282010 (NJ)
lsnavely@pillaraught.com
4201 E. Park Circle
Harrisburg, PA 17111
Telephone:  717-308-9629
Facsimile:  717-686-9862

*Attorneys for Defendant Branch Banking and Trust Company*

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ................................................................................. iii

**I.    COUNTERSTATEMENT OF MATERIAL FACTS** ................................. 1

    1.    Branch Banking And Trust Company And Real Estate Valuations .................... 1

    2.    Licenses/Certifications ..................................................................... 1

    3.    The ARO Position .......................................................................... 2

    4.    The REE Position ........................................................................... 6

    5.    USPAP, The REVS Process Manual, And Review Process ............................... 9

    6.    ARO's/REE's Job Is Risk Management And Legal/Regulatory Compliance ..................................................................................... 9

    7.    BB&T's Review Of ARO/REE Positions For Exempt Classification Status ..... 10

**II.   ARGUMENT** .......................................................................................... 11

    1.    Plaintiffs Have Failed To Establish That They Are Entitled To Judgment As A Matter Of Law Regarding The Professional Exemption .......................... 11

        A.    Plaintiffs Cannot Rely Upon Lay Opinions Regarding Exemptions ...... 12

        B.    The ARO/REE Positions Falls Within the Professional Exemption ....... 13

            i.    AROs'/REEs' Work Requires Advanced Knowledge ................ 13

            ii.    Real Estate Appraisal Is A Field Of Science Or Learning .......... 15

            iii.    AROs/REEs Require A Specialized Course Of Study ............... 15

    2.    Plaintiffs Have Failed To Establish That They Are Entitled To Judgment As A Matter Of Law Regarding The Administrative Exemption ...................... 17

        A.    The Undisputed Facts Demonstrate That The AROs'/REEs' Primary Duties Are Directly Related To BB&T's General Business Operations .......................................................................... 17

B.     The AROs'/REEs' Primary Duties Include The Exercise Of Discretion And Judgment With Respect To Matters of Significance ............................................................................ 22

3.     Plaintiffs Have Failed To Establish That They Are Entitled To Judgment As A Matter Of Law As To The Highly-Compensated Employee Exemption ......................................................................................... 25

4.     Plaintiffs' FLSA Claims Cannot Extend Beyond The Two-Year Statute of Limitations Period Because There Is No Evidence Of Any Willful Violations ............................................................................................ 27

5.     Plaintiffs' Are Not Entitled To Liquidated Damages Because Defendant Acted Reasonably And In Good Faith ........................................................ 29

III.     CONCLUSION ............................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**CASES**

<u>Antiskay v. Contemporary Graphics and Bindery, Inc.</u>,
2013 WL 6858950  (D.N.J. Dec. 26, 2013) ........................................................ 12, 18, 19, 20

<u>Boyd v. Bank of America, et al</u>,
109 F. Supp.3d 1273 (C.D. Cal. 2015) ................................................................. 21, 22, 26, 28

<u>Clarke v. JPMorgan Chase Bank, N.A.</u>,
2010 WL 1379778 (S.D.N.Y. Mar. 26, 2010) .............................................................. 12

<u>Colella v. City of New York</u>,
986 F. Supp. 2d 320 (S.D.N.Y. 2013) ........................................................................ 28

<u>Crowe v. Examworks, Inc.</u>,
136 F. Supp. 3d 16 (D. Mass. 2015) .......................................................................... 24

<u>EEOC v. Westinghouse Elec. Corp.</u>,
869 F.2d 696 (3d Cir. 1989) ........................................................................................ 28

<u>Estrada v. Maguire Ins. Agency, Inc.</u>,
2014 WL 795996 (E.D. Pa. Feb. 28, 2014) ............................................................... 25

<u>Gallardo v. AIG Domestic Claims, Inc.</u>,
2013 WL 12077819 (C.D. Cal. July 24, 2013) .......................................................... 23

<u>Hawks v. City of Newport News, Va.</u>,
707 F. Supp. 212 (E.D. Va. 1988) .............................................................................. 29

<u>In re Enterprise Rent-a-Car Wage & Hour Practices Litig.</u>,
2012 WL 4356762 (W.D. Pa. Sept. 24, 2012) .......................................................... 20

<u>In re RBC Dain Rauscher Overtime Litig.</u>, 7
703 F. Supp. 2d 910 (D. Minn. Mar. 31, 2010) ......................................................... 26

<u>Johnson v. Big Lots Stores, Inc.</u>,
604 F. Supp. 2d 903 (E.D. La. 2009) ......................................................................... 29

<u>Martin v. Cooper Electric Supply Co.</u>,
940 F.2d 896 (3d Cir. 1991), ................................................................................. 20, 29

<u>McLaughlin v. Richland Shoe Co.</u>,
486 U.S. 128 (1988) .............................................................................................. 27, 28

iii

Mike v. Safeco Ins. Co. of Am.,
274 F. Supp. 2d 216 (D. Conn. 2003) ........................................................... 12

Oswley v. San Antonio Independent School District,
187 F.3d 521 (5th Cir. 1999) ............................................................... 14, 16

Pippins v. KPMG, LLP,
759 F.3d 235 (2d Cir. 2014) ............................................................... 14, 16

Piscione v. Ernst & Young, LLP,
171 F.3d 527 (7th Cir. 1999) ................................................................... 14

Roe-Midgett v. CC Servs., Inc.,
512 F.3d 865 (7th Cir. 2008) ................................................................... 23

Rutlin v. Prime Succession, Inc.,
220 F.3d 737 (6th Cir. 2000) ................................................................... 16

Smith v. Johnson and Johnson,
2008 WL 5427802 (D.N.J. Dec. 30, 2008) ..................................................... 20

Souyavong v. Lackawanna County,
872 F.3d 122 (3d Cir. 2017) ................................................................... 27

Stevins v. Provident Const. Co.,
137 Fed. Appx. 198 (11th Cir. 2005) .......................................................... 16

Swartz v. Windstream Communications, Inc.,
2010 WL 2723213 (W.D. Pa. July 8, 2010) .................................................... 23

Swartz v. Windstream Communications, Inc.,
429 Fed. Appx. 102 (3d Cir. 2011) ..................................................... 18, 19, 22

Urnikis-Negro v. American Family Property Services, Inc.,
2008 WL 5539823 (N.D. Ill. July 21, 2008) ................................................... 24

Weis v. Advanced Construction Services, Inc.,
2005 WL 2176829 (W.D. Pa. Aug. 19, 2005) .................................................. 25

**STATUTES**

12 U.S.C. § 3331 ........................................................................................ 2

29 C.F.R. § 541.2 ..................................................................................... 12

29 C.F.R. § 541.200 ...................................................................................................17

29 C.F.R. § 541.200(a)(2) .....................................................................................17, 19

29 C.F.R. § 541.200(b) ...............................................................................................24

29 C.F.R. § 541.201(a) ..........................................................................................18, 20

29 C.F.R. § 541.202(a) ...............................................................................................22

29 C.F.R. § 541.202(b) ...............................................................................................23

29 C.F.R. §§ 541.300 ..................................................................................................13

29 C.F.R. § 541.301(a) ...............................................................................................13

29 C.F.R. § 541.301(b) ...............................................................................................13

29 C.F.R. § 541.301(c) ...............................................................................................15

29 C.F.R. § 541.301(d) .........................................................................................15, 16

29 C.F.R. § 541.301(f) ................................................................................................16

29 C.F.R. § 541.305(b) ...............................................................................................14

29 C.F.R. § 541.601(a) ...............................................................................................26

29 C.F.R. § 541.700 ...................................................................................................17

29 C.F.R. § 541.701 ...................................................................................................26

29 C.F.R. § 541.704 ...................................................................................................23

29 C.F.R. § 541.708 ...................................................................................................13

29 U.S.C. § 260 ...........................................................................................................29

## OTHER AUTHORITIES

69 Fed. Reg. 22122, 22151 (Apr. 23, 2004) .........................................................21, 22

I.     **COUNTERSTATMENT OF MATERIAL FACTS[1]**

1.     **Branch Banking and Trust Company And Real Estate Valuations.**

BB&T offers clients a complete range of financial services, including commercial lending.  [SUMF, ¶ 7; Supp. SUMF, ¶ 1.]  The Office of the Comptroller of the Currency ("OCC"), Board of Governors of the Federal Reserve System ("FRB"), Federal Deposit Insurance Company ("FDIC"), the Office of Thrift Supervision ("OTS"), and the National Credit Union Administration ("NCUA") (collectively referred to as "the Agencies") have issued Interagency Appraisal and Evaluation Guidelines ("Guidelines").  [Supp. SUMF, ¶ 163.] Pursuant to those Guidelines, BB&T cannot extend a commercial loan without a real estate appraisal or, where appropriate, a real estate evaluation.  [SUMF, ¶ 8; Supp. SUMF, ¶ 2.] To that end, BB&T maintains a Real Estate Valuation Services department ("REVS") which supports numerous lines of business and whose primary focus is managing real estate collateral risk through providing and ensuring timely, cost effective, quality and compliant real estate valuations.  [Supp. SUMF, ¶ 3.]  Within REVS is the Real Estate Appraisal Department ("READ"), which serves the organization through the overall management of the appraisal review process, as well as the Real Estate Evaluations Group ("REEG"), which serves the organization through the preparation of internally prepared real estate evaluations. [SUMF, ¶¶ 7, 12; Supp. SUMF, ¶¶ 4, 5.]

2.     **Licenses/Certifications.**

Appraisal Review Officers ("AROs") (employed within READ) must be state certified/licensed general or residential appraisers.  [SUMF, ¶ 6; Supp. SUMF, ¶ 9.] In turn, Real

_____

[1] Simultaneous herewith, Defendant has filed a Response to Plaintiffs' Statement of Undisputed Facts, as well as a Supplemental Statement of Undisputed Facts.  Defendant adopts these facts as true for purposes of summary judgment _**only**_.

Estate Evaluators ("REEs") (employed within REEG) must be state certified/licensed general or residential appraisers or working towards that certification.   [Supp. SUMF, ¶ 10.]   Under the provisions of Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, the Appraisal Qualifications Board ("AQB") establishes the minimum education, experience, and examination requirements for real property appraisers to obtain a state license or certification.   See 12 U.S.C. § 3331, *et seq.*   Each state must implement appraiser certification requirements that meet, at a minimum, the education requirements issued by the AQB.   Id.

The AQB requires that applicants for the Certified General Real Property Appraiser and Certified Residential Real Property Appraiser hold a Bachelor's degree or higher from an accredited college or university.   [Supp. SUMF, ¶¶ 13, 15.]   The AQB further requires that Certified General Real Property Appraiser applicants complete three hundred (300) creditable class hours in the Required Core Curriculum and three thousand (3,000) hours of qualifying experience obtained in no fewer than thirty (30) months, where a minimum of one thousand five hundred (1,500) hours must be obtained in non-residential appraisal work.   [Id. at ¶ 14.]   Certified Residential Real Property Appraiser applicants must complete two hundred (200) creditable class hours in the Required Core Curriculum and two thousand five hundred (2,500) hours of qualifying experience obtained in no fewer than twenty-four (24) months.   [Id., ¶ 16.]   Appraisers must then pass an AQB-approved examination and complete continuing education to ensure that they maintain and increase their skill, knowledge, and competency in real property appraising.   [Id., ¶¶ 17, 18.]

All AROs in this matter hold a Bachelor's Degree, and, at all times employed by BB&T, held an appraiser certification/license.   [Supp. SUMF, ¶¶ 21-25, 26.]   Of the nine (9) REEs in this matter, eight (8) held an appraiser certification/license.   [Supp. SUMF, ¶¶ 21-25, 27-29.]

3.      **The ARO Position.**

The primary purpose of the ARO position is to "conduct appraisal reviews on appraisals ordered by the Real Estate Appraisal Department (READ), and assist the Bank's lending and administrative personnel in the implementation of appraisal policy and procedure."  [Supp. SUMF, ¶ 35.]  AROs are required to possess the education, expertise and competency to perform appraisal reviews commensurate with the complexity of the transaction, type of real property and market.  [Id., ¶ 35.]  Most appraisal reviews performed by AROs are on commercial properties, which are more complex than residential appraisals in that different and more varied appraisal techniques and methodologies are used; there is a greater knowledge and experience base needed for understanding these appraisal methodologies; and the types of commercial properties (i.e. convenience stores, multi-family homes, golf courses) and issues associated with those commercial properties are quite varied.  [Id., ¶ 36.]

Once an ARO receives a new assignment, the first step is usually for the ARO to identify certain appraisers from BB&T's Appraisal Registry to whom they should bid that appraisal report.  [Supp. SUMF, ¶ 40.]  AROs select the appropriate appraisers based on property type and geographic competency.  [Id., ¶ 41.]

Once the appraisal report is completed and sent to the ARO, the ARO must then determine what Review Level is necessary —a Level 1 Compliance Review, a Level 2 Abbreviated Technical Review (Risk Review), or a Level 3 Technical Review— based on the ARO's determination of the necessary scope of work.  [Supp. SUMF, ¶ 43.]  AROs communicate their analysis, findings, and conclusions through these review reports, and through these reports, AROs are given a means by which they can address and identify all potential risks associated with the transaction, including market conditions, expectations, and the quality of data

3

used in the analysis.  [Id., ¶ 44.]  The reports contain analysis, findings, and conclusions that are unique to each ARO and reflective of his or her independent discretion and judgment on the subject matter of the report.  [Id., ¶ 45.]  Explanation and comment from the ARO must be specifically tailored to each assignment, as each appraisal is unique in its own right.  [Id., ¶ 46.]

When preparing a Level 1 Compliance Review, the ARO acts as a Compliance Officer. [Supp. SUMF, ¶ 49.]  The ARO will enter the indicated value of the collateral, the effective date of the value, the date of the appraisal report and answer the compliance review questions.  [Id., ¶ 49.]  Level 1 Compliance Reviews often require research.  [Id., ¶ 50.]  There are also times when revisions to the appraisal report are necessary, and it is the ARO's responsibility to reach out to the appraiser and tell them to make that revision.  [Id., ¶ 51.]  Level 1 Compliance Reviews are intended solely for the internal use of BB&T.  [Id., ¶ 52.]

The intent of a Level 2 Abbreviated Technical Review (Risk Review) and Level 3 Technical Review is to confirm that the value is reasonable and reliable for loan underwriting and that the appraisal is in compliance with the Uniform Standards of Professional Appraiser Practices ("USPAP").  [Supp. SUMF, ¶ 53, 61.]  The ARO must also render a decision regarding the quality of work.  [Id.]  To this end, when preparing a Level 2 Abbreviated Technical Review (Risk Review), the ARO must, in relevant part:

a.  ***Identify*** the report under review, the real estate and property rights being appraised, the effective date of the opinion of value in the report, date of the appraisal report, the effective date of the appraisal review and the date of the review report.

b.  ***Form an opinion as to the adequacy and relevance of the data*** and the ***appropriateness*** of any adjustments applied to the data.  ***The ARO must determine whether the report contains data relevant to the appraisal problem which supports the appraiser's opinions and conclusions.***

c.  ***Form an opinion*** as to the appropriateness of the methods and techniques employed in the appraisal.

4

d.  ***Form an opinion*** as to the soundness and appropriateness of the analysis, opinions and conclusions in the report under review, and explain the reasons for any disagreement with these conditions.

e.  Give a brief description of the ***reasonableness of the analysis***; . . .

f.  ***Discuss significant issues*** which effect the value, such as property conditions, zoning, compliance issues and highest and best use.

g.  Appropriate deductions and discounts ***should be analyzed*** and reported for certain valuation scenarios. . .

h.  ***Provide a final decision regarding the reasonableness of the analysis and credibility of the report*** consistent with USPAP AO-20 without a reviewer opinion of value when "Accepted" or "Accepted as Appraiser Revised," or if "Accepted as Reviewer Modified" with a reviewer opinion of value.

i.  Comply with the standard rules of the USPAP promulgated by the Appraisal Foundation.

j.  ***Conclude*** whether the appraisal information received from the appraiser is ***reasonable and supportable***. . . The ARO has the responsibility to ensure the most appropriate value is reported given the Purpose of the Loan submitted with the request.

[Id., ¶ 54 (emphasis added).]

Level 2 Abbreviated Technical Reviews (Risk Reviews) and Level 3 Technical Reviews often require independent research on comparable rental data, comparable sales data, or something to do with the specific property.  [Supp. SUMF, ¶ 55.]  Ultimately, the ARO will determine whether the value is reasonable and reliable for loan underwriting based upon the review of the appraisal and any independent research.  [Id., ¶ 56.]  The intended use of these Reviews is to assist BB&T in establishing a collateral value in a lending transaction.  [Id., ¶¶ 58, 63.]  The analysis, opinions, and conclusions in the Reviews are based on an ARO's personal, unbiased professional analyses, opinions, and conclusions.  [Id., ¶¶ 59, 64.]  No one provides AROs with significant professional assistance in completing these Reviews  [Id., ¶¶ 60, 65.]

Often, AROs encounter appraisal reports that do not meet BB&T's quality standards

and/or communicate a credible market value estimate.  [Supp. SUMF, ¶ 68.] When this occurs, AROs have to address those deficiencies with the appraiser to get them corrected.  [Id.]  AROs also act as a liaison between the appraiser, lending staff, and management to ensure that independence is maintained in accordance with regulatory requirements.  [Id., ¶¶ 70-71.]

The final step in completing a Level 2 Abbreviated Technical Review (Risk Review) or a Level 3 Technical Review is to grade appraisers on their appraisal reports.  [Supp. SUMF, ¶ 72.] If an appraiser rating falls below a certain threshold, that appraiser may be subject to removal or suspension from the BB&T Appraiser Registry.  [Id., ¶ 73.]

**4.      The REE Position.**

The primary purpose of the REE position is to "[p]erform independent evaluations[2] of real estate serving as collateral for business loans that meet evaluations standards" and "[c]onduct a thorough analysis of real estate property to provide an estimate of the real estate's market value."  [Supp. SUMF, ¶ 83.]  REEs are required to possess the appropriate appraisal or collateral valuation education, expertise, and experience relevant to the type of property being valued.  [Id., ¶ 85.]  REEs must be aware of and be able to correctly employ recognized methods and techniques that are necessary to produce a credible evaluation report.  [Id., ¶ 83.]

Once a REE receives a new assignment, the REE has to determine whether he/she is competent, which speaks to the knowledge and experience to complete the evaluation assignment, as well as to the analytical or appraisal methodologies necessary for the assignment. [Supp. SUMF, ¶ 88.]  REEs next determine the scope of work necessary to undertake the assignment, for instance: what data sources to use; who to talk to; steps taken to perform the

---

[2] An evaluation is a "valuation permitted by the agency's appraisal regulations for transactions that qualify for the appraisal threshold exemption, business loan exemption or subsequent transaction exemption."  [Supp. SUMF, ¶ 87.]

evaluation; and what level of data needs to be in the evaluation. [Id., ¶ 89.]  The scope of work varies from property to property and evaluation to evaluation.  [Id., ¶ 90.]

REEs then notify the loan officer and/or engagement specialist as to what additional due diligence is required to perform an adequate evaluation, such as a missing rent roll, an up-to-date operating statement, or a lease.  [Supp. SUMF, ¶ 91.]  The documents needed to perform an adequate evaluation vary from property to property.  [Id., ¶ 92.]

The REE also needs to set-up an inspection of the property, and it is the responsibility of the REE to determine the appropriate degree of inspection to produce a credible evaluation result.  [SUMF, ¶ 26; Supp. SUMF, ¶ 93.]  Inspections are not completed the same way for each property, and the scope of the inspection depends on the property type.  [Supp. SUMF, ¶ 94.]

To complete a valuation, REEs also need to identify appropriate comparable properties (hereinafter "comparables"), and make adjustments from these comparables to support an opinion regarding the value of the property.  [SUMF, ¶ 27; Supp. SUMF, ¶ 95.]  Determining which comparables to give more weight varies by property and assignment.  [Supp. SUMF, ¶ 96.]  REEs use their independent judgment and discretion in selecting appropriate comparables. [Id., ¶ 97.]  However, comparables are not the only analytical tool REEs use to value property, and REES must also independently analyze the effect of economic, social, and other trends on a particular real estate market.   [Id., ¶ 98.]   For instance, REEs must analyze whether neighborhood maintenance levels are excellent, good, average, fair or poor by reading an inspection report and analyzing neighborhood trends and values.  [Id., ¶ 99.]  REEs also have to analyze whether the demand and supply of available properties is in balance, over-supplied, or short by reading market reports, examining data, and observing trends.  [Id., ¶ 100.]  REEs also research whether there are known adverse site conditions, the highest and best use of the

property, and overall real estate trends, which Plaintiff Shelley testified he knew how to do based on his years of experience as an appraiser.  [Id., ¶ 101.]

Furthermore, if the property is a leased income producing property, a REE must analyze all of the encumbering leases, operating expenses, tenant quality and current investment rates and associated risks for the specific property type in order to determine a market value.  [Supp. SUMF, ¶ 102.]  The REE must also research comparable leases and market based expenses to ensure the subject's leases and operating expense ratios are within market expectations and if not, make adjustments accordingly to mirror investor typical expectations.  [Id., ¶ 102.]  If the property is a special use property such as a gas station/convenience store, hotel or car wash, a REE must analyze the financial history, operating expenses, investment rates and multipliers in order to discern a market value of the property's "going concern" value.  [Id., ¶ 103.]

Once due diligence and research is complete, the REE determines what level of evaluation report to complete (Level 1, Level 2, Level 3, or Level 4) and then documents his/her evaluation through an evaluation report which details the analysis, assumptions, and conclusions to support the estimated property value. [Supp. SUMF, ¶ 105.]  REEs are expected to use their own judgment and discretion to render an opinion regarding a property's market value; they perform their own analysis and come to their conclusions independently; and no one should provide them with any "suggested" value to assign to a property.  [Id., ¶ 107.]

The purpose of a Level 1 Evaluation is to determine whether the use of a tax assessment or prior appraised value is safe for lending.  [Supp. SUMF, ¶ 109.]  The purpose of Level 2, 3, and 4 Evaluations is to estimate the value(s) of the real estate collateral specified as of the effective date(s) cited in the report.  [Id., ¶¶ 115, 120, 125.]  These Evaluations include a narrative which details the analysis, assumptions, and conclusions to support the estimated

property value.  [Id., ¶¶ 112, 117, 122.]   The analysis, opinions, and conclusions in the Evaluations are based on a REE's personal, impartial, unbiased professional analyses, opinions, and conclusions.   [Id., ¶¶ 113, 118, 123.]  No one provides REEs with significant professional assistance in completing these Evaluations, and these Evaluations are intended for the sole use of BB&T.  [Id., ¶¶ 110, 114, 116, 119, 121 124, 126.]

     **5.**     **USPAP, The REVS Process Manual, And Review Process.**

 AROs and REEs are required to follow USPAP, and USPAP is "the guideline for which a professional appraiser should practice whether they practice as an appraiser, as they practice as a reviewer, as they practice as an evaluator."  [Supp. SUMF, ¶ 133.]  Critically, USPAP does not tell an individual how to appraise, and it does not provide a formula for opining on a property's value.  [Id., ¶¶ 135-136.]  AROs and REEs must also comply with the REVS Process Manual and compliance documents in performing their jobs.  [SUMF, ¶ 57; Supp. SUMF, ¶¶ 145, 155.]  USPAP, the REVS Process Manual, nor the compliance documents tell an ARO or REE:  how to determine appropriate comparables; how to determine highest and best use of a property; how to do an inspection of the property;  which appraisal methodology to apply; how to determine whether neighborhood maintenance levels are excellent, good, average, fair or poor; whether demand and supply of available properties is in balance, over-supplied, or short; and/or whether the overall real estate values are increasing, stable, in slow decline, or in rapid decline. [Id., ¶¶ 137-143, 146-162.]

     **6.**     **AROs'/REEs' Job Is Risk Management And Legal/Regulatory Compliance.**

The Agencies guidelines address "supervisory matters relating to real estate appraisals and evaluations used to support real estate-related financial transactions."  [Supp. SUMF, ¶ 163.]  Among other things, these Guidelines include a specific emphasis on the appraisal review

function itself and provide detailed requirements for the depth and substance of each review—including a determination as to whether the methods, assumptions, and value conclusions therein are reasonable—as well as the qualifications of the appraisal reviewers themselves.  [Id.]

BB&T is committed to complying, and maintaining compliance, with all applicable laws, rules, regulations, and regulatory guidance.  Consistent with this commitment, BB&T has developed a framework that uses three (3) mutually supportive lines of defense to manage risk. [Supp. SUMF, ¶ 165.]  The second line of defense is formed by the Risk Management Organization ("RMO"), which provides independent risk management oversight and guidance to the individual business units.  [Id.]  REVS is within the RMO.  [Id.]

If an ARO or REE "gets it wrong" in his or her role as such (even on a single transaction), it creates the potential for substantial risk to BB&T and includes, by way of example and not limitation, regulatory/compliance risk, financial and credit risk, reputational risk, operational risk, the overextension of funds, inappropriate valuation functions, and the risk of regulatory criticism.  [Supp. SUMF, ¶¶ 167-171.]

Notably, AROs and REEs do not sell loans on commercial properties; they do not underwrite loans on commercial properties; and they do not generate any loans on commercial properties.  [SUMF, ¶¶ 71, 95; Supp. SUMF, ¶¶ 172-173.]

**7.    BB&T Review Of ARO/ REE Positions For Exempt Classification Status.**

In 2013, Cara Nobles Morris, a Compensation Consultant III in BB&T's Human Systems department, evaluated the ARO and REE job families to determine their classification under the Fair Labor Standards Act ("FLSA").  [SUMF, ¶ 98; Supp. SUMF, ¶¶ 175, 180.]  As part of this job evaluation process, she spoke with three (3) different managers within the department regarding the job responsibilities of AROs and REEs.  [Supp. SUMF, ¶ 182.]  She also had two

(2) managers complete Manager Questionnaires to capture the duties and responsibilities of the ARO and REE jobs.  [Id., ¶ 183.]  Ms. Morris also pulled information regarding similar jobs in the marketplace.  [Id., ¶ 184.]

Based upon of all this information, Ms. Morris concluded that the ARO and REE positions could be properly classified as exempt under the FLSA.  [Supp. SUMF, ¶ 185.]  Ms. Morris then sent this information to her team within Human Systems in advance of a call.  [Id., ¶ 186.]  The purpose of that forum was for individuals to ask any and all questions and "poke holes" in the determination before the final decision was sent to executive management.  [Id., ¶ 187.]  No one within the team disagreed with the decision to classify the ARO and REE positions as exempt under the FLSA.  [Id., ¶ 188.]  Exemption status under the FLSA was determined only by the Human Systems department.  [Id., ¶¶ 188-190.]

## II.     ARGUMENT[3]

### 1.     Plaintiffs Have Failed To Establish That They Are Entitled To Judgment As A Matter Of Law Regarding The Professional Exemption.

Plaintiffs argue via footnote —without any substantive briefing— that AROs and REEs are not exempt under the professional exemption of the FLSA because (1) Defendant did not utilize the professional exemption in classifying AROs and REEs as exempt over the past years; and (2) because BB&T does not require individuals in these positions to hold an academic degree.  [See Brief in Support (Dkt. No. 60-1), p. 8 n. 3.]  Both of Plaintiffs' arguments, for the

---

[3] For purposes of brevity, and because Defendant believes that the ARO and REE positions are both properly exempt, Defendant addresses applicability of the FLSA exemptions as to both the ARO and REE positions under the same Sections in this Brief.  However, Defendant notes, as set forth in the Counterstatement of Facts, that the ARO and REE positions are distinct positions that perform similar, but different, responsibilities.  Accordingly, should this Court disagree with Defendant's analysis that both positions are exempt under the FLSA, this Court has the right to separately classify either of those positions as properly exempt.

reasons set forth below, fail.

### A.    Plaintiffs Cannot Rely Upon Lay Opinions Regarding Exemptions.

Through the course of this litigation, Defendant admitted that during the period of time from April 15, 2013 to present, BB&T's Human Systems department, who was responsible for determining FLSA exemption status for the AROs and REEs, "did not classify the [REE or ARO] position[s] . . . as exempt from overtime compensation based on the professional employee exemption under Section 13(a)(1) of the Fair Labor Standards Act." [Resp. to SUMF, ¶ 2.]  Plaintiffs now seek to use this as Defendant's waiver of the professional exemption in this matter.  However, this argument holds no weight.

Lay opinions regarding an employee's exemption status are irrelevant to whether the job duties qualify the ARO and REE positions as exempt under the FLSA as a matter of law.  To be sure, "the nature of an employee's duties are questions of fact, but the ultimate question of whether an employee is exempt under the FLSA is an issue of law." Antiskay v. Contemporary Graphics and Bindery, Inc., 2013 WL 6858950, *10 n. 11 (D.N.J. Dec. 26, 2013). Furthermore, the exempt status of an employee depends upon the analysis of an employee's job duties.  See 29 C.F.R. § 541.2 ("The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the [exemption].").  Therefore, the merits of a plaintiff's claim must turn on the "day-to-day tasks, and not upon any . . . company policy or decision." Mike v. Safeco Ins. Co. of Am., 274 F. Supp. 2d 216, 221 (D. Conn. 2003).  Cf. Clarke v. JPMorgan Chase Bank, N.A., 2010 WL 1379778, *22 (S.D.N.Y. Mar. 26, 2010) (incorrect reclassification by an employer cannot extinguish a valid exemption) (collecting cases).

Plaintiffs have not (because they cannot) point to one decision where an employer has

been precluded from asserting an exemption defense based on a failure to utilize and identify that exact exemption in the past. Such an illogical result is not consistent with the FLSA in that "work that is exempt under one section . . . will not defeat the exemption under any other section." 29 C.F.R. § 541.708.

### B.   The ARO/REE Positions Fall Within The Professional Exemption.

The learned professional exemption requires that the employees' "primary duty . . . be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized instruction." 29 C.F.R. § 541.301(a). The following requirements must be met: (1) the employee must be compensated on a salary basis at a rate of not less than $455 per week; and (2) the employee's primary duties consist of (a) "work requiring advanced knowledge," (b) "in a field of science or learning," and (c) the "advanced knowledge must be customarily acquired by a prolonged course of specialized instruction." 29 C.F.R. §§ 541.300 and 541.301(a)(1)-(3). There is no dispute that AROs and REEs were paid at least $455 per week to meet the salary threshold.[4] Moreover, the undisputed facts demonstrate that AROs and REEs satisfy each remaining element as a matter of law.

### i.   AROs'/REEs' Work Requires Advanced Knowledge.

"Work requiring advanced knowledge" means work "which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment." 29 C.F.R. § 541.301(b). Furthermore, "[a]n employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret, or make deductions from varying facts or circumstances." Id. The discretion and judgment standard for the professional exemption is "less stringent" than the discretion and independent judgment

---

[4] See Supp. SUMF, ¶¶ 34, 81; see also Plaintiffs' Brief in Support of Partial Motion for Summary Judgment (Dkt. No. 60-1), p. 23 (stating that the salary-basis test is "not at issue here.").

standard of the administrative exemption. *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, the Preamble to the 2004 Final Rule*, 69 Fed. Reg. 22122, 22151 (Apr. 23, 2004). The professional exemption is characterized by "app[lication] [of] special knowledge or talents with judgment and discretion." Id. (quoting 29 C.F.R. § 541.305(b)).

"[W]orkers apply discretion in the application of advanced knowledge when they interpret and analyze information central to the practice of the profession." Pippins v. KPMG, LLP, 759 F.3d 235, 250-251 (2d Cir. 2014). See e.g. Piscione v. Ernst & Young, LLP, 171 F.3d 527, 543, 545 (7th Cir. 1999) (human resources consultant who dealt with financial planning and performed "both routine and complex tasks . . . [and] frequently . . . exercise[d] discretion with regard to the analysis of data," was a learned professional because "[a]n employee may be required to collect information, but would still be within the professional exemption if he had to interpret that data, as well").[5]

Here, there is no dispute that AROs and REEs regularly rely on advanced knowledge of appraisal practices, and they practice that judgment and discretion characteristic of their profession. To that end, AROs' work consists of reviewing appraisal reports to confirm that the value is reasonable and reliable for loan underwriting and that the appraisal is in compliance with USPAP. [Supp. SUMF, ¶ 35.] In doing so, AROs must interpret and analyze data to determine

---

[5] Furthermore, "workers may be found to exercise professional judgment even when their discretion in performing their core duties is constrained by formal guidelines, or when ultimate judgment is deferred to higher authorities." Pippins, 759 F.3d at 243. See e.g. Oswley v. San Antonio Independent School District, 187 F.3d 521 (5th Cir. 1999) (athletic trainers did not lack discretion and judgment even though they performed duties within "standard treatment guidelines" and "act[ed] under the supervision and the direction of the team physician" because there was "no immediate expectation of physician intervention" and "no evidence that the physicians supervise the trainers' activities at all times, or even most of the time. Instead, trainers exercised discretion through making discrete decisions dependent on specialized knowledge").

whether the appraisal information received from the appraiser is reasonable and supportable, and the quality of work is sufficient. [Id., ¶¶ 44, 54.]  Similarly, REEs' work consists of valuing real estate used as collateral in commercial lending, which requires REEs to independently research and analyze data related to comparables and other trends on a particular real estate market. [Id., ¶¶ 83, 87-107.]  Plaintiffs could do none of this without utilizing their advanced knowledge about real estate markets and appraising.

### ii.    Real Estate Appraisal Is A Field Of Science Or Learning.

The phrase "field of science or learning," includes "occupations that have a recognized professional status."  29 C.F.R. § 541.301(c).  Federal and state law requires that appraisers are state licensed/certified and comply with professional standards similar to other "traditional" professionals.  See 29 C.F.R. § 541.301(c) ("field of science or learning" includes the "traditional professions of law, medicine, theology, accounting, actuarial computation, engineering, architecture, teaching, various types of physical, chemical and biological sciences, pharmacy, and other similar occupations").

It is undisputed that AROs and REEs (as licensed/certified appraisers) perform valuable professional services for BB&T.  It is also undisputed that to be able to perform these valuable, professional services, these AROs and REEs must rely upon and know highly specialized appraisal methodologies and principles. [Supp. SUMF, ¶¶ 37, 85-86.]  Therefore, AROs and REEs perform work "in a field of science or learning."

### iii.    AROs/REEs Require A Specialized Course Of Study.

Finally, the phrase "customarily acquired by a prolonged course of specialized intellectual instruction" means "professions where specialized academic training is a standard prerequisite for entrance into the profession."  29 C.F.R. § 541.301(d).

Here, the vast majority of the Plaintiff AROs and REEs required a prolonged, specialized education in appraising to fulfill their roles at BB&T, in that eleven (11) of the twelve (12) Plaintiffs held state-issued appraisal certification/licenses.  [See Section I.2, *supra*.][6]  See e.g. Pippins, 759 F.3d at 250-251 (holding that Audit Associates hired by KPMG were professionally exempt because they were generally required to be either eligible or nearly eligible to come licensed as Certified Public Accountants); Oswley, 187 F.3d at 521 (athletic trainers were professional, in light of Texas' requirement that trainers obtain a Bachelor's degree in *any* field, but also take courses such as anatomy and physiology, perform an apprenticeship, and obtain CPR certification).

Indeed, to obtain those certifications/licenses, Plaintiffs had to complete a specialized curriculum directly related to real estate appraising.  [See Section I.2, *supra*.]  This, in and of itself, is enough to satisfy the professional exemption. 29 C.F.R. § 541.301(f) (accrediting and

---

[6] That a single REE did not have a Bachelor's Degree, or that another single REE did not have a state certification/license is not dispositive.   See  29 C.F.R. § 541.301(d) ("[T]he word customarily means that the exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction.  Thus, for example, the learned professional exemption is available to the occasional lawyer who has not gone to law school, or the occasional chemist who is not the possessor of a degree in chemistry."); see also Pippins, 759 F.3d at 250-251 ("[T]he critical inquiry is not whether there might be a single Audit Associate who does not satisfy a specific set of academic requirements, but whether the 'vast majority' of Audit Associates required a prolonged, specialized education to fulfill their role as accountants. . . [W]e reject plaintiffs' argument that KPMG's willingness to hire 'even one Audit Associate who did not have an accounting degree,' creates a material fact issue regarding whether Audit Associates 'required advanced accounting knowledge.'") (internal citations omitted)); Rutlin v. Prime Succession, Inc., 220 F.3d 737, 742 (6th Cir. 2000) ("The fact that Rutlin was not required to obtain a bachelor's degree fails to persuade us otherwise.  The FLSA regulations do not require that an exempt professional hold a bachelor's degree; rather the regulations require that the duties of a professional entail advanced, specialized knowledge."); Stevins v. Provident Const. Co., 137 Fed. Appx. 198 (11th Cir. 2005) ("The FLSA regulations do not require that an exempt professional hold a bachelor's degree; rather the regulations require that the duties of a professional entail advanced, specialized knowledge.").

certifying organizations "may develop similar specialized curriculums and certification programs which, if a standard requirement for a particular occupation, may indicate that the occupation has acquired the characteristics of a learned profession."). It is undisputed that these licenses/certifications relate specifically to Plaintiffs' primary duties as AROs and REEs. Accordingly, the ARO and REE positions meet all prongs of the professional exemption test. Therefore, summary judgment on this professional exemption in favor of Plaintiffs is improper.

## 2. Plaintiffs Have Failed To Establish That They Are Entitled To Judgment As A Matter Of Law Regarding The Administrative Exemption.

An individual employed in a "bona fide administrative capacity" is someone: (1) who is compensated on a salary basis of not less than $455 per week; (2) who primarily performs office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200. Again, there is no dispute that AROs and REEs were paid at least $455 per week to meet the salary threshold.[7] Moreover, the undisputed facts demonstrate that AROs and REEs satisfy the second and third requirements of the administrative exemption.

## A. The Undisputed Facts Demonstrate That The AROs'/ REEs' Primary Duties Are Directly Related To BB&T's General Business Operations.

Under this exemption, the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). An employee's "primary duty" is the "principal, main, major or most important duty that employee performs." 29 C.F.R. § 541.700.

The regulations further provide that to be "directly related to the management or general

---

[7] See Supp. SUMF ¶¶ 34, 81; see also Plaintiffs' Brief in Support of Partial Motion for Summary Judgment (Dkt. No. 60-1), p. 23 (stating that the salary-basis test is "not at issue here.").

business operations," an employee must perform work that is "directly related to ***assisting with the running and servicing of the business***, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a) (emphasis added); see also Swartz v. Windstream Communications, Inc., 429 Fed. Appx. 102, 104-105 (3d Cir. 2011); Antiskay v. Contemporary Graphics and Bindery, Inc., 2013 WL 6858950, *9 (D.N.J. Dec. 26, 2013).

For example, in Swartz v. Windstream Communications, Inc., the employee was employed as a Sales Engineer II who custom-designed telecommunication platforms for Windstream's clients.  Id. at 103.  Holding that the employee satisfied the second prong of the administrative exemption, the Third Circuit Court of Appeals stated:

> Windstream is a telecommunications provider; its business is to sell communications systems.  Swartz did not sell these systems himself. ***Rather, he assisted with the sales by custom-designing telecom systems to meet each prospective customer's unique needs.  In this manner, Swartz's primary duty constituted work that serviced Windstream's core business –the sale of telecom systems.***

Id. at 102 (emphasis added).  Similarly, in Antiskay v. Contemporary Graphics and Bindery, Inc., plaintiff was employed as a Production Planner/Customer Service employee for a printing and fulfillment company.  2013 WL 6858950, at *1.  In holding that this position satisfied the second prong of the administrative exemption, the District of New Jersey district court stated:

> With respect to whether the type of work Plaintiff performed was directly related to Contemporary Graphics Management or General Business Operations, the Court notes at the outset that Contemporary Graphics is a printing and fulfillment company which provides design, printing, and finishing, die-cutting, warehousing, fulfillment and mailing services to its customers in order to generate printed products.
>
> In this regard, the record reflects that Plaintiff did not actually produce these printed products.  Rather, Plaintiff assisted and serviced the actual manufacturing process by converting estimates into job jackets to initiate the production process, entering job information into the company's

18

computer systems, approving proofs prior to commencement of manufacturing, receiving and responding to customer calls, emails, and requests, and monitoring the overall progress of products as they moved through different departments . . . ***In this way, Plaintiff's primary duties constituted the type of work that serviced and assisted in Contemporary Graphics' core business –the production of printed products, and the Court finds that the second prong of the administrative exemption is satisfied here.***

Id. at *11-12 (emphasis added).

The facts here warrant an identical conclusion.   It is undisputed that AROs and REEs exclusively perform non-manual work that is directly related to the general business operations of BB&T.[8]   Specifically, BB&T is a bank, and its business is to provide clients a complete range of financial services, including commercial lending.  [SUMF ¶ 7; Supp. SUMF, ¶ 1.]  AROs and REEs do not sell commercial loans; they do not underwrite loans on commercial properties; and they do not generate any loans on commercial properties.  [SUMF, ¶¶ 71, 95; Supp. SUMF, ¶¶ 172-173.]  Rather, AROs and REEs assist and service the sale of commercial loans by advising the lending side, through their reviews and evaluations, as to the soundness of the value of a certain property.  [See Supp. SUMF, ¶ 175.]  To that end, and similar to the plaintiff employees in both Swartz and Antiskay, the AROs' and REEs' primary duties constitute work that services BB&T's core business –the sale of commercial loans.

Furthermore, it is undisputed that the jobs of AROs and REEs is risk management and regulatory compliance.   Housed within the RMO, AROs' and REEs' primary focus is managing real estate collateral risk through providing and ensuring timely, cost effective, quality and compliant real estate valuations. [Supp. SUMF, ¶ 3.]

---

[8] The fact that REEs and AROs did not participate in the management of the business is simply inapposite.  See 29 C.F.R. § 541.200(a)(2) (stating that "primary duty is the performance of office or non-manual work directly related to the management ***or*** general business operations of the employer or the employer's customers").  See also Swartz, 429 Fed. Appx. at 102; Antiskay, 2013 WL 6858950, at *1.

Plaintiffs' argument that they must be considered production workers rather than administrative employees under the administrative/production dichotomy analysis in Martin v. Cooper Electric Supply Co., 940 F.2d 896 (3d Cir. 1991), flounders in both law and fact. The "Martin regulations defined work 'directly related to management policies or general business operations' as limited to employees performing 'work of substantial importance to the management or operation of the business.'" Smith v. Johnson and Johnson, 2008 WL 5427802, *8 (D.N.J. Dec. 30, 2008). The current regulations (which are applicable in this case) dropped the "substantial importance" requirement and spelled out a much more expansive administrative exemption. See 29 C.F.R. § 541.201(a). Thus, the Martin decision is not controlling here.

Moreover, many cases "analyze the primary duty test without referencing the . . . dichotomy at all . . . because . . . the dichotomy is but one analytical tool, to be used only to the extent it clarifies the analysis." Antiskay, 2013 WL 6858950, at *12 (internal citations and quotations omitted). "That is, a district court should only consider the administrative/production dichotomy analysis to be determinative where the employee's work falls squarely on the production side of the line." Id. (internal citations and quotations omitted). Therefore, "[t]he administrative/production dichotomy turns on whether the services or goods provided by the employee constitute the marketplace offerings of the employer, or whether they contribute to the running of the business itself." In re Enterprise Rent-a-Car Wage & Hour Practices Litig., 2012 WL 4356762, *17 (W.D. Pa. Sept. 24, 2012).

AROs and REEs do not produce products, and their primary duty is not to "produce reports." AROs and REEs communicate their analysis, findings, and conclusions through appraisal review reports and evaluation reports, respectively. Simply, these reports are a ***means*** by which AROs and REEs can address and identify all potential risks associated with the real

estate securing the transaction, including market conditions, expectations, and the quality of data used in the analysis.  These reports are intended for the sole use of BB&T, and AROs' and REEs' completion of these reviews and evaluations is a "support function auxiliary" to BB&T's primary function of commercial lending, and not the marketplace offerings of BB&T (i.e. the commercial loans).  Because Plaintiffs' duties do not fall squarely on the production side, the administrative/production dichotomy is not determinative in this case.

Plaintiffs' last-ditch reliance on (non-binding) Boyd v. Bank of America, et al, 109 F. Supp.3d 1273 (C.D. Cal. 2015) ("Boyd Litigation") to hold that AROs and REEs are not administratively exempt because they are "production" employees is plain wrong.  The facts in the Boyd Litigation led to a much different conclusion than is warranted here.  Specifically:

- The appraisers at issue in the Boyd Litigation were employees of Landsafe Appraisal Services, Inc. ("LAS").  LAS was a wholly-owned subsidiary of Bank of America, Corp. ("BAC").  LAS' core product was appraisal services and thereby provided market value appraisals products to BAC.  In that sense, the employees at issue were engaged in the exact business of the subsidiary, i.e. generating appraisals.  Boyd, 109 F. Supp.3d at 1278.  Those facts lend very differently to a "production" conclusion as opposed to here, where AROs and REEs: are housed directly in the RMO of BB&T; engage in work that is specific to risk management and legal and regulatory compliance; and provide review and valuation conclusions that service and assist in the Bank's core business – commercial lending.

- The appraisers at issue in the Boyd Litigation produced residential appraisals, Boyd, 109 F. Supp.3d at 1278, as opposed to the AROs and REEs in this matter who primarily performed commercial appraisals.  Performing reviews and evaluations on commercial properties is more complex than appraising residential properties.  [Supp. SUMF ¶¶ 36, 84.]

- Appraisers in the Boyd Litigation generated 20,000 reports each month (or **240,000 per year**).  Boyd, 109 F. Supp.3d at 1278.  Here, AROs typically perform **12,000 reviews per year**, and REEs typically perform **6,000 evaluations per year**.  [Resp. to SUMF, ¶¶ 19, 36.]

- Appraisers in the Boyd Litigation were paid on commissions.  Boyd, 109 F. Supp.3d at 1278.  Here, all AROs and REEs received a base salary of more than $455 per week.  Furthermore, ARO/REE IIs and IIIs were eligible for a corporate

21

annual incentive (the target is ten percent (10%), and within that, fifty percent (50%) of that incentive is based on individual performance, and fifty percent (50%) of that is based on overall corporate performance).  [Supp. SUMF, ¶¶ 34, 81.]

- All appraisals in the <u>Boyd</u> Litigation were subject to an automated review.  <u>Boyd</u>, 109 F. Supp.3d at 1281.  Here, only certain appraisal reviews and evaluations were reviewed.  [Supp. SUMF, ¶¶ 74-77, 130-132.]

Based upon all of these important distinctions, Plaintiffs cannot rely upon this opinion to argue that "[p]roduction-based Appraisers employed in-house by banks are non-exempt."

And, despite Plaintiffs' representation to this Court, the <u>Boyd</u> Litigation decision is an absolute "outlier."  No other decision has addressed and held that positions similar to those of the AROs and REEs are non-exempt employees.  Indeed, Plaintiffs admit as such by failing to identify one other case that has done so, instead relying on cases that discuss mortgage underwriters and loan underwriters specifically involved in the sales of loans.  [See id., p. 31.][9]

**B.  The AROs'/REEs' Primary Duties Include The Exercise Of Discretion And Judgment With Respect To Matters of Significance.[10]**

"Department of Labor regulations explain that 'the exercise of discretion and independent judgment involves the comparison and evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.'"  <u>Swartz</u>, 429 Fed. Appx. at 105 (citing 29 C.F.R. § 541.202(a)).  Furthermore, whether an employee exercises discretion and independent judgment on "matters of significance" is a fact-specific

---

[9] Even the DOL Opinion Letter from 1986 that concludes that "appraisers" are non-exempt does not help Plaintiffs' argument.  That Opinion Letter discusses exemption status for "appraisers" who were provided "illustrations of houses which typify the various appraisal classifications." [Supp. SUMF, ¶ 194.] Where an "'appraiser' was assigned to appraise a house which did not fit into one of the classifications," that appraiser then had to "obtain verification of the appraisal by [an] appraiser assistant." [Id.]  As discussed above, this is very different from the primary duties of the AROs and REEs at issue in this matter.

[10] Here, Plaintiffs do not contest (and thereby concede) that they exercised the requisite discretion and independent judgment.  [See Brief in Support (Dkt. No. 60-1), p. 32.]

inquiry, guided by a non-exhaustive list of regulatory factors including, but not limited to, "whether the employee carries out major assignments in conducting the operations of the business"; "whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business"; and "whether the employee investigates and resolves matters of significance on behalf of management." 29 C.F.R. § 541.202(b).

As set forth in detail in the Counterstatement of Facts, Plaintiffs engaged in all of these activities.[11] And, with respect to these factors, "courts generally find that employees who meet at least two or three of these factors are exercising discretion and independent judgment, although a case-by-case analysis is required." Swartz v. Windstream Communications, Inc., 2010 WL 2723213, *5 (W.D. Pa. July 8, 2010) (citing 69 Fed.Reg. 22122, 22143 (Aug. 23, 2004) (citing cases)).

Moreover, the AROs' and REEs' exercise of that discretion and independent judgment is critical to Defendant's business. Indeed, BB&T cannot even extend a commercial loan without a

---

[11] That AROs and REEs had to utilize certain "templates" or "forms" and/or comply with USPAP, the REVs Process Manual, certain compliance documents, and federal regulations does not divest AROs and REEs of their discretion and independent judgment. See 29 C.F.R. § 541.704 ("The use of manuals, guidelines, or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption."); See also e.g. Gallardo v. AIG Domestic Claims, Inc., 2013 WL 12077819, *9 (C.D. Cal. July 24, 2013) ("While it is true that Defendant had regulations and guidelines providing procedures, rules, and preformatted templates, those procedures only guided Plaintiff's decision-making to the extent that they specified routine matters such as various administrative processes and the format and content guidelines for reports. Defendant's procedures did not direct him how to negotiate a settlement in a particular case, evaluate a witness's credibility at deposition, or respond to a specific question from a judge or objection from opposing counsel. Accordingly, the procedures Plaintiff followed did not divest him of the exercise of independent judgment."); Roe-Midgett v. CC Servs., Inc., 512 F.3d 865, 875 (7th Cir. 2008) ("[I]ndependent judgment is not foreclosed by the fact that an employee's work is performed in accordance with strict guidelines.")

real estate appraisal or, where appropriate, a real estate evaluation.  Without appropriately

qualified, licensed, and certified AROs and REEs, BB&T would most certainly be criticized for

an inappropriate appraisal and evaluation program.  [Supp. SUMF, ¶ 168.]  Furthermore, if an

ARO or REE "gets it wrong" in his or her role as such (even on a single transaction), it creates

the potential for substantial risk to BB&T and includes, by way of example and not limitation,

regulatory/compliance risk, financial and credit risk, reputational risk, operational risk, the

overextension of funds, inappropriate valuation functions, and the risk of regulatory criticism.

[Id., ¶¶ 164-167.]  Simply stated, the nature of, and potential for, all of these risks is substantial,

and BB&T could not operate successfully without the risk management and legal and regulatory

compliance operations that the AROs and REEs perform.  These circumstances all weigh heavily

in favor of satisfying the third prong of the administrative exemption.  See 29 C.F.R. §

541.200(b) (considering "whether the employee performs work that affects business operations

to a substantial degree, even if the employee's assignments are related to operation of a particular

segment of the business.").

Rather, the AROs' and REEs' duties are more aligned to those cases where courts have

found the administrative exemption applicable.  See e.g. Crowe v. Examworks, Inc., 136 F.

Supp. 3d 16, 42 (D. Mass. 2015) (work of a clinical quality assurance coordinator ("CQAC")

required the exercise of discretion and independent judgment where CQAC:  had to make an

independent choice in reaching the conclusion that reviewing physician has erred or that his or

her rationale was not clear, resulting in a conversation with the reviewing physician; had to

determine "whether the reviewing physician's rational is supportable," and had to "determine

whether the information in the case file was sufficient to demonstrate that a request was related

to the injury") (internal citations omitted); Urnikis-Negro v. American Family Property Services,

Inc., 2008 WL 5539823, *3 (N.D. Ill. July 21, 2008) ("One of the key aspects of a real estate appraisal is to determine appropriate 'comparables' (comparable properties).  The associate appraiser would include in his or her report . . . a selection of comparable properties, as well as the adjustments necessary to determine a value for the property being appraised.  The selection of comparables involves the exercise of judgment."); Estrada v. Maguire Ins. Agency, Inc., 2014 WL 795996, *6-7 (E.D. Pa. Feb. 28, 2014) (claims examiner exercised discretion and independent judgment by evaluating and making recommendations regarding coverage; inspecting property damage; interviewing witnesses and insured; distinguishing genuine claims from fraudulent claims; and determining liability and the value of the claims); Weis v. Advanced Construction Services, Inc., 2005 WL 2176829, *1 (W.D. Pa. Aug. 19, 2005) (cost estimator had independence and discretion where he "note[d] missing information from the drawings . . ., formulate[d] questions to obtain the needed information, [and] contact[ed] the client or architect to get the information to do [the] estimates;" located and contracted subcontractors; determined scope of work; qualified the submitted bids; made subjective judgments as to whether the bids were adequate by comparing them against his own estimates; and determined the appropriate bid price).  Accordingly, as the ARO and REE positions meet the administrative exemption test, summary judgment in favor of Plaintiffs is inappropriate.

### 3.   Plaintiffs Have Failed To Establish That They Are Entitled To Judgment As A Matter Of Law As To The Highly-Compensated Employee Exemption.

Under the "Highly-Compensated Employee" provision, an employee will qualify as an exempt, "highly compensated employee" if he: (1) receives a weekly salary of at least $455; (2) receives total annual compensation (or if he receives a pro rata portion of the $100,000 for the portion of the 52-week period that they worked) of at least $100,000; (3) primarily performs office or non-manual work; and (4) "customarily and regularly performs any *one* or more of the

exempt duties or responsibilities of an executive, administrative or professional employee … ." 29 C.F.R. § 541.601(a) (effective through Nov. 30, 2016).

Without identifying any specific Plaintiffs who meet the salary threshold, and relying once again on the Boyd Litigation decision, Plaintiffs make the blanket argument that the highly-compensated employee exemption does not apply because the court cannot "deconstruct" the AROs' and REEs' duties.  Respectfully, the Boyd Litigation decision does not properly apply the exemption as written.   To satisfy the exemption, in relevant part, the employee must "customarily and regularly perform[ ] any one or more of the exempt duties or responsibilities of an . . .  administrative or professional employee[.]"  29 C.F.R. § 601(a) (effective through Nov. 30, 2016).  The regulations define the phrase "customarily and regularly" to mean "a frequency that must be greater than occasional but which, of course, may be less than constant.  ***Tasks*** or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek: it does not include isolated or one-time ***tasks***."  Id. at § 541.701 (emphasis added).  Therefore, the regulation, itself, requires that a court look at discrete tasks. See e.g. In re RBC Dain Rauscher Overtime Litig., 703 F. Supp. 2d 910, 943 (D. Minn. Mar. 31, 2010) ("[E]ven if the employee's exempt duties are ancillary to nonexempt duties, and even if the employee sends most of his or her work time performing nonexempt duties, the employee may qualify for the exemption if he or she customarily and regularly performs at least one exempt duty).[12]

---

[12] Defendant has argued in their Partial Motion for Summary Judgment that Opt-In Ralph Pena III satisfies this exemption.  [See Defendant's Brief in Support of Partial Motion for Summary Judgment, Section IV.3.]

4.     **Plaintiffs' FLSA Claims Cannot Extend Beyond The Two-Year Statute of Limitations Period Because There Is No Evidence Of Any Willful Violations.**

To warrant application of the three-year statute of limitations, a plaintiff must provide evidence that the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988).  The Third Circuit Court of Appeals recently clarified what constitutes a willful violation necessary to trigger the third year of liability under the FLSA.  In Souyavong v. Lackawanna County, the Court held that "awareness of the FLSA on a basic level" was not enough to establish willfulness, and "[w]illful FLSA violations require a more specific awareness of the legal issue."  872 F.3d 122, 126 (3d Cir. 2017); see also id. at 126 ("Acting only 'unreasonably' is insufficient –some degree of actual awareness is necessary.")  Second, the Court held that for an FLSA violation to be willful, it "must have a degree of egregiousness."  Id. at 127.

Here, no willful violation can be found.  Indeed, the classification decision at issue was the product of a thorough review led by Ms. Morris, an employee within BB&T's Human Services department who had received specific training on the FLSA.  [Supp. SUMF, ¶¶ 175-190.]

Plaintiffs' arguments to the contrary fail.  First, Plaintiffs argue that in 2013, when Defendant reviewed the ARO and REE positions for FLSA classifications, the current REVS manager raised concerns with the Human Systems department about the significant financial impact of classifying REEs as non-exempt and having to pay them overtime. [See Brief in Support (Dkt. No. 60-1), p. 42.]  However, the undisputed facts show that the Human Systems department was the only department that determined FLSA exemption status, and that no manager's thoughts or comments regarding exemption status factored into that decision at all. [Supp. SUMF, ¶¶ 189-190.]

Next, Plaintiffs argue that Defendant's actions showed deliberate indifference to REEs' and AROs' proper legal status because the Human Systems department never consulted with BB&T's Legal Department. [See Brief in Support (Dkt. No. 60-1), p. 42.] But, the "Supreme Court has rejected making the question of willfulness 'turn on whether the employer sought legal advice' because that would 'permit a finding of willfulness to be based on nothing more than negligence.'" Colella v. City of New York, 986 F. Supp. 2d 320, 327 (S.D.N.Y. 2013) (citing McLaughlin, 486 U.S. at 134-35).

Plaintiffs also argue that Defendant's failure to take into account a Department of Labor Opinion Letter concluding appraisers are non-exempt evidences willfulness. [See Brief in Support (Dkt. No. 60-1), p. 42.] Notably, Ms. Morris was not aware of that February 25, 1986 Opinion Letter. [Supp. SUMF, ¶ 194.] Regardless, the Opinion Letter is not dispositive here because, as discussed above, the facts therein are different from the primary duties of the AROs and REEs.

Finally, Plaintiffs' argument that Defendant's knowledge of the decision in the Boyd Litigation evidences willful misconduct is not persuasive. [See Brief in Support (Dkt. No. 60-1), p. 43.] "While stubborn non-compliance in the face of contrary judicial authority might well constitute willfulness, good-faith adherence to, and defense of, those policies when the law is unsettled does not establish a willful violation." EEOC v. Westinghouse Elec. Corp., 869 F.2d 696, 712 (3d Cir. 1989). Simply stated, the Third Circuit Court of Appeals (nor any district court herein) has not addressed whether individuals with duties similar to those of the AROs and/or REEs are exempt under the FLSA. Moreover, for all the reasons discussed above, the facts of the Boyd Litigation are sufficiently differen to warrant a different conclusion in this matter.

Perhaps most tellingly on this issue, Plaintiff Shelley owns and operates an appraisal

company called Gregory James Company, Incorporated.  All appraisers who work for Plaintiff Shelley are 1099 employees, and none of these appraisers are paid overtime. [Supp. SUMF, ¶ 197.]   Yet, Plaintiffs claim willful misconduct here?   Plaintiffs are not entitled to summary judgment.

### 5.     Plaintiffs' Are Not Entitled To Liquidated Damages Because Defendant Acted Reasonably And In Good Faith.

Assuming, *arguendo*, that the ARO and REE positons were misclassified, Defendant respectfully submits that liquidated damages should not be awarded because the misclassification(s) giving rise to this lawsuit was/were made in good faith and there were reasonable grounds to believe that the AROs and REEs should be classified as exempt employees under the FLSA.  See 29 U.S.C. § 260; cf. Johnson v. Big Lots Stores, Inc., 604 F. Supp. 2d 903, 925 (E.D. La. 2009) ("The purpose of section 260 is to allow the court to lessen the harshness of the liquidated damages provision by imposing merely compensatory damages").  In order to satisfy its burden in demonstrating that its actions were taken in good faith, and its belief reasonable, an employer "must show that [it] took affirmative steps to ascertain the [FLSA]'s requirements, but nonetheless, violated its provisions." Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 908 (3d Cir. 1991).  For the same reasons discussed in Section V.7, *supra*, Defendant has shown that it acted in good faith.  At no point in this process can it be said that BB&T somehow "remain[ed] blissfully ignorant of FLSA requirements." Hawks v. City of Newport News, Va., 707 F. Supp. 212, 217 (E.D. Va. 1988) (no liquidated damages awarded) ("The Court finds that the defendant made a conscientious effort to comply with the FLSA by conducting the two studies of the executive status of fire captains and lieutenants.  As a result of these two studies, the defendant had reasonable grounds for believing that the denial of overtime compensation to plaintiffs was not a violation of the FLSA.").

## III.    CONCLUSION

For the foregoing reasons, Defendant Branch Banking and Trust Company respectfully requests that the Court deny Plaintiffs' Partial Motion for Summary Judgment in its entirety.

Respectfully submitted,

/s/*Lindsey E. Snavely*
Lindsey E. Snavely, Esquire
**PILLAR AUGHT LLC**
Attorney I.D. No. 001282010 (NJ)
lsnavely@pillaraught.com
4201 E. Park Circle
Harrisburg, PA 17111
Telephone:  717-308-9629
Facsimile:  717-686-9862

*Attorneys for Defendant Branch Banking and Trust Company*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of February, 2018, a true and correct copy of the foregoing document was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Patricia Barasch, Esquire
Schall & Barasch
Moorestown Office Center
110 Marter Avenue, Suite 302
Moorestown, NJ  08057
pbarasch@schallandbarasch.com
*Attorney for Plaintiffs*

Bryan J. Schwartz, Esquire
Eduard R. Meleshinsky, Esquire
Rachel Terp, Esquire
Bryan Schwartz Law
1330 Broadway, Suite 1630
Oakland, CA  94612
bryan@bryanschwartzlaw.com
eduard@bryanschwartzlaw.com
rachel@bryanschwartzlaw.com
*Attorneys for Plaintiffs*

/s/ *Lindsey E. Snavely*