**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ————————————————— : | |
| PHILLIP KARALI and GREGORY : | |
| SHELLEY, on behalf of themselves and : | |
| all others similarly situated : | |
| : | |
| Plaintiffs, : | Civil Action No. 16-02093-BRM-TJB |
| : | |
| v. : | |
| : | **OPINION** |
| BRANCH BANKING AND TRUST : | |
| COMPANY; DOES 1-10, INCLUSIVE, : | |
| : | |
| Defendants. : | |
| —————————————————: | |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Phillip Karali and Gregory Shelley's, on behalf of themselves and all others similarly situated ("Plaintiffs") Motion for Partial Summary Judgment (ECF No. 60) as well as Branch Banking and Trust Company's ("BB&T" or "Defendant") Motion for Partial Summary Judgment on the same issues (ECF No. 71). Both motions were opposed (ECF Nos. 70, 79). Having reviewed the submissions filed in connection with the motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause shown, Plaintiffs' Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART** and Defendant's Motion for Partial Summary Judgment is **DENIED**.

## I.    BACKGROUND

This matter concerns allegations made by the Plaintiffs – a group of Appraisal Review Officers ("AROs") and Real Estate Evaluators ("REEs") – that BB&T misclassified their

employment and accordingly deprived them of overtime compensation to which they are entitled under federal law. Plaintiffs filed a Motion for Partial Summary Judgment arguing that BB&T may not rely on certain inapplicable overtime pay exemptions contained in the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA") and seeking an extended statute of limitations and liquidated damages due to BB&T's alleged bad faith. Defendant then filed a Motion for Partial Summary Judgment claiming the AROs and REEs qualified for the various FLSA exemptions, and asserting that the Plaintiffs' request for an extended statute of limitations and liquidated damages should be dismissed.

## II.   PROCEDURAL HISTORY

On April 15, 2016, Plaintiffs filed a Complaint against BB&T on behalf of themselves and a putative class of AROs and REEs, seeking overtime compensation pursuant to the FLSA. (ECF No. 1.) Under the same Complaint, Plaintiff Phillip Karali ("Karali") also brought an individual claim pursuant to the New Jersey State Wage and Hour Law, N.J.S.A. 34:11-56a4 ("NJWHL") (*Id.*) On May 9, 2017, this Court conditionally certified the matter under the FLSA. (ECF No. 48.) In addition to the named plaintiffs, ten additional individuals – eight REEs and two AROs – have opted-in to this lawsuit.[1]

On November 2, 2017, Plaintiffs filed a Motion for Partial Summary Judgment asserting that the federal administrative exemption does not apply to AROs and REEs, the highly compensated employee exemption does not apply to AROs and REEs, and BB&T's willful misclassifications demand a three-year statute of limitations and liquidated damages. (ECF No.

---

[1] The REEs who have opted-in include Ralph Pena (ECF No. 27), Marvin Wooley (ECF No. 28), Mary Jarrett-Jones (ECF No. 29), Elisabeth Hamrick (ECF No. 50), Jared Harrison (ECF No. 52), Jeremy Woodruff (ECF No. 53), Irene Degraw (ECF No. 54), and Todd Wood (ECF No. 56). The AROs who have opted-in include John Gapszewicz (ECF No. 32) and Nancy Smith (ECF No. 51.)

60-1.) On February 23, 2018, BB&T filed an Opposition to the Plaintiffs' Partial Summary Judgment Motion (ECF No. 70) and filed a Motion for Partial Summary Judgment asserting, *inter alia*, that the ARO/REE positions fall within the FLSA's administrative exemption, the ARO/REE positions fall within the FLSA's learned professional exemption, Plaintiffs' FLSA claims cannot extend beyond two years as there is no evidence of any willful violation, and Plaintiffs are not entitled to liquidated damages. (ECF No. 71-1). On March 12, 2018, Plaintiffs filed an Opposition to BB&T's Partial Summary Judgment Motion. (ECF No. 79.)

### III. FACTUAL BACKGROUND

#### A. BB&T and Real Estate Evaluations

BB&T is a bank that engages in commercial lending and other similar financial services. (ECF No. 73 ¶ 1; ECF No. 80 ¶ 1.) Before approving the sale of loans, extensions of credit, or other financial products, BB&T must obtain valuations of the collateral real estate in the form of an appraisal or an evaluation. (ECF No. 60-2 ¶ 8.) BB&T maintains a Real Estate Evaluation Services Department ("REVS") which supports various lines of business and, among other things, provides compliant real estate valuations. (ECF No. 73 ¶ 3; ECF No. 80 ¶ 3.) REVS is divided into three separate "line of defense" areas: (1) the Real Estate Evaluations Group ("REEG"); (2) the Real Estate Appraisal Department ("READ"); and (3) the REVS Compliance Department. (ECF No. 73 ¶ 4; ECF No. 80 ¶ 4.) READ deals with the appraisal review process and REEG prepares internal real estate valuations. (ECF No. 73 ¶¶ 5-6; ECF No. 80 ¶¶ 5-6.) AROs and REEs produce reports which BB&T requires in its process of determining whether to extend a loan or credit to a borrower. (ECF No. 73 ¶ 7; ECF No. 80 ¶ 7.)

#### B. Required State Licensure/Certification

BB&T's AROs must be state certified general or residential appraisers. (ECF No. 73 ¶ 9;

ECF No. 80 ¶ 9.) Pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, the Appraisal Qualifications Board ("AQB") establishes the minimum education, experience, and examination requirements for real property appraisers to obtain a state license or certification. *See* 12 U.S.C. § 3331, *et seq.* Each state must implement appraiser certification requirements that at least meet the minimum education requirements established by the AQB. *Id.* Appraisers must also pass an approved examination and satisfy continuing education requirements. (ECF No. 73 ¶¶ 17-18; ECF No. 80 ¶¶ 17-18.)[2] All of the opt-in plaintiffs possess at least a bachelor's degree, with the exception of Plaintiff Gregory Shelley who holds an associate's degree from Coosa Valley Technical College and an MBA from Louisiana State University, and Marvin Wooley, who held only a Certified General Appraiser License while employed at BB&T. (ECF No. 73 ¶¶ 19-29; ECF No. 80 ¶¶ 19-29.)

### C.  The ARO Position and ARO Evaluations

AROs receive a salary of more than $455 per week and are eligible for an annual "corporate incentive" of approximately 10%, which is based on individual and overall corporate performance. (ECF No. 73 ¶ 34; ECF No. 80 ¶ 34.) The ARO's purpose is to conduct appraisal reviews on appraisals ordered by READ and subsequently produce accompanying appraisal reports. (ECF No. 73 ¶ 35; ECF No. 80 ¶ 35.) BB&T's AROs primarily produce commercial appraisal reviews related to specific properties being used by particular borrowers, who pay approximately $300-500 per review. (ECF No. 73 ¶ 36; ECF No. 80 ¶ 36.) AROs typically produce about two reviews per day. (*Id.*) AROs are independent in that they do not consult with

---

[2] The Court notes that the Plaintiffs made a Request for Judicial Notice of the 2008 AQB National Appraiser Licensing Standards, the 2015 AQB National Appraiser Licensing Standards, the 2018 National Appraiser Licensing Standards, and the Compendium of State Appraisal Licensing Requirements. (ECF No. 77.) Defendant opposed this request. (ECF No. 83.) This request is moot for the purposes of the disposition of these motions.

the borrower, underwriter, or loan officer in the course of preparing their reports. (ECF No. 73 ¶ 38; ECF No. 80 ¶ 38.) However, an ARO is unable to reject an appraisal request without the permission of his or her supervisor. (ECF No. 60-2 ¶ 43; ECF No. 69 ¶ 43.)

Once an ARO receives a new assignment, the first step is for him or her to identify certain appraisers from BB&T's Appraisal Registry, and such appraisers are then invited to submit bids. (ECF No. 73 ¶ 40; ECF No. 80 ¶ 40.) Once the appraisal report is completed, the ARO determines the appropriate review level: Level 1 Compliance Review; Level 2 Abbreviated Technical Review (Risk Review); or Level 3 Technical Review. (ECF No. 73 ¶ 43; ECF No. 80 ¶ 43.) The ARO is solely responsible for ensuring that the loan report prepared is accurate and appropriate. (ECF No. 71-6 at 147.)

When preparing a Level 1 Compliance Review, the ARO indicates the valuation, the date of the valuation, and answers the relevant form compliance review questions. (ECF No. 73 ¶ 49; ECF No. 80 ¶ 49.) Completing a Level 1 Compliance Review requires gathering data from various sources as well as researching public records and contacting the tax assessor's office. (ECF No. 73 ¶ 50; ECF No. 80 ¶ 50.) Level 1 Compliance Reviews are intended solely for the internal use of BB&T or its affiliates. (ECF No. 73 ¶ 52; ECF No. 80 ¶ 52.)

When preparing a Level 2 Abbreviated Technical Review, AROs must confirm the value is reasonable and reliable for loan underwriting and that the appraisal complies with the Uniform Standards of Professional Appraiser Practice ("USPAP"). (ECF No. 73 ¶ 53; ECF No. 80 ¶ 53.) The intended use of a Level 2 Abbreviated Technical Review is to assist BB&T in establishing a collateral value in a lending transaction. (ECF No. 73 ¶ 58; ECF No. 80 ¶ 58.) The REVS Process Manual outlines the role of AROs in preparing a Level 2 Abbreviated Technical Review as follows: identifying the report under review, the real estate rights being appraised, and the

5

date of such appraisal; forming an opinion as to the adequacy and the relevance of the data, the methods and techniques in the appraisal, and the soundness of the analysis; discussing significant issues which effect the property value; analyzing appropriate deductions and discounts; providing a final decision regarding the credibility of the report; and concluding whether the appraisal information received is reasonable and appropriate. (ECF No. 71-2 at 47; ECF No. 71-7 at 18; ECF No. 61-12.) Additionally, AROs often consider comparable properties ("comparables") and rely on their experience as certified appraisers in making their ultimate determinations. (ECF No. 73 ¶¶ 55-57; ECF No. 80 ¶¶ 55-57.) Level 3 Technical Reviews are substantially similar to Level 2 Abbreviated Technical Reviews in both their purpose and the ARO's process of completing such reviews. (ECF No. 73 ¶¶ 61-67; ECF No. 80 ¶¶ 61-67.)

The final step in completing a Level 2 or 3 Technical Review is grading the appraisers on their appraisal reports. (ECF No. 73 ¶ 72; ECF No. 80 ¶ 72.) AROs respond to mandatory prompts concerning appraisal performance as part of BB&T's regimented appraisal review process. (*Id.*) Among other things, AROs are tasked with considering whether the information provided was credible and whether it provided sufficient information necessary for an accurate review. (ECF No. 71-1 at 56-58; ECF No. 71-2 at 58.) If an appraiser's rating falls below a certain threshold, that appraiser may be subject to discipline, including removal from BB&T's Appraiser Registry. (ECF No. 73 ¶ 73; ECF No. 80 ¶ 73.)

AROs' reports are closely supervised and reviewed for adherence to the Review Compliance Checklist. (ECF No. 73 ¶ 74; ECF No. 80 ¶ 74.) Every month, REVS' Compliance Department reviews at least two reviews per ARO to confirm regulatory compliance around the valuation services. (ECF No. 73 ¶ 75; ECF No. 80 ¶ 75.) The additional level of ARO oversight by BB&T's management, if any, is contested.

### D.  The REE Position and Real Estate Evaluations

REEs receive a salary of more than $455 per week and REE IIs and IIIs are eligible for an annual "corporate incentive" of approximately 10%, which is based on individual and overall corporate performance. (ECF No. 73 ¶ 81; ECF No. 80 ¶ 81.) The primary purpose of the REE is to perform independent evaluations of real estate serving as collateral for business loans that meet evaluation standards, and conduct an analysis of real estate property to provide an estimate of the real estate's market value. (ECF No. 73 ¶ 83; ECF No. 80 ¶ 83.) REEs generally evaluate commercial properties, for which potential borrowers pay approximately $300-500 per review. (ECF No. 73 ¶ 84; ECF No. 80 ¶ 84.)  REEs are required to possess the appropriate appraisal or collateral valuation expertise relevant to the type of property being valued, and must further be aware of and understand methods and techniques necessary to produce a credible valuation report. (ECF No. 73 ¶¶ 85-86; ECF No. 80 ¶¶ 85-86.)

BB&T defines a real estate evaluation as a "valuation permitted by the agency's appraisal regulations for transactions that qualify for the appraisal threshold exemption, business loan exemption or subsequent transaction exemption." (ECF No. 71-7 at 32.) Because there are three types of basic approaches to valuing a property, namely income approach, cost approach, and sales approach, the REEs determine the scope of work necessary to undertake the assignment. (ECF No. 73 ¶ 89; ECF No. 80 ¶ 89.) REEs are required to inspect the property being valued and ensure that the inspection suffices to complete the appraisal reports. (ECF No. 73 ¶ 93; ECF No. 80 ¶ 93.) In completing valuations, REEs follow guidelines established in the BB&T REVS manual and, like AROs, consider comparables. (ECF No. 73 ¶¶ 95-96; ECF No. 80 ¶¶ 95-96.) The extent of analysis of comparables required to complete a review, and the discretion afforded to REEs to do so, is contested. (ECF No. 73 ¶¶ 97-99; ECF No. 80 ¶¶ 97-99.) Additionally, the

parties also dispute the breadth of outside research REEs must conduct in order to produce an accurate and effective review, as well the scope of analysis required for variables such as encumbered leases, operating expenses, and special use properties. (ECF No. 73 ¶¶ 100-108; ECF No. 80 ¶¶ 100-108.)

REE Evaluations are classified as Level 1, Level 2, Level 3, or Level 4. The purpose of a Level 1 REE Evaluation is to determine whether the use of a tax assessment or prior appraisal is safe for lending. (ECF No. 73 ¶ 109; ECF No. 80 ¶ 111.) The purpose of Level 2, Level 3, and Level 4 REE Evaluations is to estimate the value of the real estate collateral specified as of the effective date in the evaluation report. (ECF No. 73 ¶¶ 115, 120, 125; ECF No. 80 ¶¶ 117, 122, 127.) These Evaluations are used by BB&T in the underwriting process. (ECF No. 73 ¶ 110; ECF No. 80 ¶ 112.) Each Evaluation must compile sufficient information to support the appraisal value, as required by BB&T's guidelines and regulations. (ECF No. 73 ¶111; ECF No. 80 ¶ 113.) The extent of analysis required for each report, as well as the level of discretion afforded to the REEs and oversight mandated, are contested. (ECF No. 73 ¶¶ 127-129; ECF No. 80 ¶¶ 129-131.)

Certain REE Evaluations are reviewed via an Evaluation Compliance Checklist ("ECC") by an Evaluations Regional Manager or other REE designated for risk oversight purposes. (ECF No. 73 ¶ 130; ECF No. 80 ¶ 132.) Approximately 25% of the evaluations from the REEG department receive an ECC. (ECF No. 73 ¶ 131; ECF No. 80 ¶ 133.) Two evaluations per REE per month are reviewed by the REVS' Compliance Department to confirm regulatory compliance around the valuation services. (ECF No. 73 ¶ 132; ECF No. 80 ¶ 134.)

### E.  USPAP and REVS Manual Requirements for AROs and REEs

AROs and REEs are required to follow the USPAP, which sets guidelines for appraisers, reviewers, and evaluators. (ECF No. 73 ¶ 133; ECF No. 80 ¶ 135.) The USPAP emphasizes that

appraisers must be independent and non-biased when valuing properties and that they must use objective research and analysis to produce credible property valuations. (ECF No. 73 ¶ 134; ECF No. 80 ¶ 136.) The USPAP does not provide explicit guidelines on how to perform an appraisal or how to consider comparables, but rather provides information on what must be included in each report.[3] (ECF No. 71-3 at 221.) The REVS Process Manual provides BB&T's internal guidelines for AROs and REEs, including but not limited to information on: conflicts of interest; accepting orders; ordering appraisals; the appraisal review process; appraiser registry management; vendor evaluations; internal evaluations; disputes and escalations; vendor management; quality control; invoicing; and access management. (ECF No. 72-1 at 3-5.) Like the USPAP, the REVS Process Manual does not provide explicit guidelines on how to perform an appraisal or how to consider comparables, but rather focuses on BB&T's internal policies and expectations of AROs and REEs. (ECF No. 72-1.)

### F. BB&T's Classification of AROs and REEs

BB&T's Human Systems Division has a job evaluation review process, whereby it determines job grade, salary, incentives, and potential exemptions under the FLSA. (ECF No. 73 ¶ 175; ECF No. 80 ¶ 177.) In determining how to classify a position for FLSA exemption purposes, BB&T's Human Systems Division speaks with numerous business managers and direct managers to gain an understanding of the essential duties and responsibilities associated with the position. (ECF No. 73 ¶ 176; ECF No. 80 ¶ 178.) Following its investigation, the Human Systems Division determined that the ARO I, II, and III positions and the REE I and II positions should be classified as exempt from overtime pay requirements under the FLSA. (ECF

---

[3] BB&T makes several allegations concerning the contents of the USPAP, however, neither party has provided the USPAP in its moving papers, nor has either party made a motion for this Court to take judicial notice of its content. Ultimately, the precise content of the USPAP proves immaterial in the disposition of these motions.

No. 73 ¶ 178; ECF No. 80 ¶ 180.)

In 2013, REVS – which was then known as Risk Operations-Real Estate Services – sought to achieve "consistency in job grades" between the AROs and REEs, as well as to create an REE III position to "mirror the progression provided within READ." (ECF No. 73 ¶ 179; ECF No. 80 ¶ 181.) To assist in this process, BB&T's Human Systems Division employed a Compensation Consultant III, Cara Nobles Morris, who studied the FLSA in obtaining her designation as Senior Professional in Human Resources ("SPHR") from the Society of Human Resources Management ("SHRM"). (ECF No. 73 ¶¶ 180-181; ECF No. 80 ¶¶ 182-183.) Morris spoke with at least three different managers within various departments – Beth McClain, Lamar Jerman, and Mark Stephens – to deduce the job responsibilities of AROs and REEs. (ECF No. 73 ¶ 182; ECF No. 80 ¶ 184.) Morris also had Jerman and Stephens complete Manager Questionnaires concerning the duties and responsibilities of AROs and REEs and the training, education, and experience levels required to obtain each job. (ECF No. 73 ¶ 183; ECF No. 80 ¶ 185.) Based on the questionnaires, her conversation with the managers, and other outside research concerning similar positions at other institutions, Morris determined the ARO and REE positions should be classified as exempt under the FLSA. (ECF No. 73 ¶ 185; ECF No. 80 ¶ 187.) Morris then sent her recommendation to the Human Systems Division, which adopted her recommendation. (ECF No. 73 ¶¶ 186-189; ECF No. 80 ¶¶ 188-191.) At the time of the recommendation, Morris alleges not to have been aware of the classification of appraisers as non-exempt under the FLSA at Wells Fargo and JPMorgan Chase, the decision in *Boyd, et al. v. Bank of America Corp., et al.*, 109 F. Supp. 3d 1273, 1287 (C.D. Cal. 2015),[4] nor of the United

---

[4] *Boyd* held, *inter alia*, that real estate appraisers conducting substantially similar work to the AROs and REEs in this litigation were production workers and thus nonexempt from the FLSA's overtime pay requirements under the administrative exemption. 109 F. Supp. 3d at 1287.

States Department of Labor Wage and Hour Division's February 25, 1986 Opinion Letter concerning the FLSA exemption status of administrative employees and appraisers. (ECF No. 73 ¶¶ 191-194; ECF No. 80 ¶¶ 193-196.)

## IV.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3rd Cir. 1991) (citing *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.), *cert. denied*, 474 U.S. 1010 (1985)); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party bears the burden of persuasion at trial, summary judgment is appropriate only if the evidence is not susceptible to different interpretations or inferences by the trier of fact. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex*, 477 U.S. at 330 (Brennan, J., dissenting). Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## V.   DECISION

### A.  The FLSA's Administrative Exemption

Under the FLSA's administrative exemption, employees who work in a "bona fide. . . administrative. . . capacity" are exempt from overtime pay requirements. 29 U.S.C. § 213(a)(1). In order to qualify for the administrative exemption, three conditions must be met: (1) the employee must be compensated on a salary or fee basis at a rate of not less than $455 per week, exclusive of board, lodging, or other facilities; (2) the employee's "primary duty" must be the "performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) the employee's primary duty must include "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). This analysis must consider "all the facts involved in the particular employment situation in which the question arises." 29 C.F.R. § 541.202(b). These three conditions are "explicit prerequisites to exemption, not merely suggested guidelines for judicial determination of the employer's status." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960). Moreover, these three exemptions "are to be narrowly construed against the employers seeking to assert them, and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Id.*

The first prong of the FLSA's administrative exemption is not at issue, as the parties concede that AROs and REEs were paid above the statutory minimum to qualify for the exemption. (ECF. No. 60-1 at 23; ECF No. 71-1 at 19.) Plaintiffs argue that BB&T cannot plainly and unmistakably satisfy prongs two and three. (ECF No. 60-1 at 23.) On the contrary,

BB&T asserts the undisputed facts demonstrate that the roles of the AROs and REEs satisfy the latter two prongs. (ECF No. 71-1 at 19.)

An employee's primary duty is the "principal, main, major or most important duty that the employee performs." 29 C.F.R. 541.700(a). "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* In determining the primary duty of an employee, factors to consider include, *inter alia*, the importance of the employee's duties as compared with "other duties," the amount of time spent performing exempt work, the employee's relative freedom from direct supervision, and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. *Id.* Moreover, in order for an employee's duties to be "directly related to the management or general business operations," such employee "must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. 541.201(a).

The Third Circuit uses the "administrative-productive work dichotomy" in determining whether certain employees qualify for the administrative exemption, with "administrative" employees being exempt and "productive" employees being nonexempt. *See Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 902 (3d Cir. 1991); *see also In re Enterprise Rent-a-Car Wage & Hour Employment Practices Litig.*, Case No. 07-cv-1687, 2012 WL 4356762, *17 (W.D. Pa. Sept. 24, 2012). Recently, the Ninth Circuit provided useful insight on the administrative-productive work dichotomy, noting the purpose of this distinction is "to distinguish 'between work related to the goods and services which constitute the business' marketplace offerings and work which contributes to 'running the business itself.'" *McKeen-Chaplin v. Provident Savings*

*Bank, FSB*, 862 F.3d 847, 851 (9th Cir. 2017) (quoting DOL Wage & Hour Div. Op. Ltr., 2010 WL 1822423, *3 (Mar. 24, 2010)).

While the parties seem to agree on the controlling law on the issue, there remain major, material factual disputes preventing this court from granting either motion for summary judgment as to the applicability of the administrative exemption. First, the parties dispute the level of supervision and oversight to which AROs and REEs were subjected (ECF No. 73 ¶ 74; ECF No. 80 ¶ 74) as well as the ability of an ARO or REE to turn down an assignment, and the consequences flowing therefrom. (ECF No. 73 ¶ 39, 85; ECF No. 80 ¶ 39, 85). Specifically, Plaintiffs dispute Defendant's assertion that AROs have the "right" to turn down an assignment. (*Id.*) Defendant cites only the deposition transcript of Ernest Lamar Jerman, Jr., who testified that AROs *may* turn down an assignment in instances where they may be unavailable to complete such assignment, such as sabbaticals, vacations, or religious observances. (ECF No. 71-9 at 63-64.) There is nothing in the record speaking to whether AROs and REEs may *freely* turn down assignments, nor the potential consequences for doing so. On the contrary, Plaintiffs assert "AROs were not able to turn down assignments readily, and managers frequently resisted any attempt to turn down an assignment." (ECF No. 80 ¶ 39; Karali Dec. (ECF No. 30-3) ¶ 11.)

Importantly, the parties also dispute the central role of AROs and REEs. Plaintiffs assert that AROs and REEs are mere production workers with little autonomy, as they merely produce reports following a checklist and according to BB&T's prescribed policies and procedures (ECF No. 30-3 ¶ 8.) Plaintiffs note that BB&T then evaluates for quantity, speed, and accuracy, thereby demonstrating their lack of autonomy and final decision-making ability. (Jerman Dep. (ECF No. 60-4) at 83). Plaintiffs further argue that each ARO/REE report relates to one lending decision, and "does not determine lending policy generally." (ECF No. 60-1 at 31.) Defendant

highlights evidence suggesting that AROs and REEs qualify as administrative employees whose primary role is regulatory and legal compliance, and not merely the production of reports. (Stephens Dec. (ECF No. 71-8) ¶ 13.) The dispute over the central role of the AROs and REEs embodies the administrative-productive dichotomy and is undoubtedly material given the Third Circuit's holding in *Martin* and its progeny.

Finally, the parties dispute whether AROs and REEs "exercise discretion and independent judgment with respect to matters of significance," as required by the third prong of the test established in 29 C.F.R. § 541.200(a). The statute provides a non-exhaustive list of factors to consider in determining whether an employee's duties satisfy the third prong, stating

> Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operation of the business . . . whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management . . . and whether the employee represented the company in handling complaints, arbitrating disputes, or resolving grievances.

29 C.F.R. § 541.202(b).

Here, facts pertinent to several of the illustrative factors laid out in 29 C.F.R. § 541.202(b) are directly disputed. For instance, Plaintiffs offer evidence suggesting that AROs and REEs had no discretion in formulating or implementing BB&T's policies and procedures (ECF No. 30-3 ¶ 8), whereas Defendant presents a declaration stating that the primary purpose of the ARO position is to "assist the Bank's lending and administrative personnel in the implementation of appraisal policy and procedure." (MacGrogan Dec. (ECF No. 71-15) ¶ 11.)

As material, factual disputes surrounding the applicability of the FLSA's administrative exemption persist, both motions for summary judgment concerning its applicability are **DENIED**.

### B. The FLSA's Highly Compensated Exemption

Pursuant to the FLSA's "highly compensated employees" rule, employees earning at least $100,000 annually are exempt from the FLSA's overtime requirement if *either* the second or third prongs of the administrative exemption are satisfied. 29 C.F.R. § 541.601(c) (effective through Nov. 30, 2016).[5] As discussed above, there are significant factual disputes surrounding both prongs two and three of the administrative exemption precluding the grant of summary judgment to either party on the applicability of such exemption. Accordingly, the parties' motions for summary judgment concerning the applicability of the FLSA's highly compensated employee exemption are **DENIED**.

### C. The FLSA's Learned Professional Exemption

Pursuant to the FLSA's learned professional exemption, an employee is exempt from the FLSA's overtime requirements if such employee's primary duty is "the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a). In order for an employee to qualify for the FLSA's learned professional exemption, three conditions must be satisfied: "(1) The employee must perform work requiring advanced knowledge; (2) The advanced knowledge must be in a field of science or learning; and (3) The advanced knowledge

---

[5] This Court notes that there have been subsequent revisions and enjoinments of certain provisions of 29 C.F.R. § 541.601, *see State of Nevada v. DOL*, Case No. 16-cv-00731, 218 F. Supp. 3d 520 (E.D. Tex. Nov. 22, 2017). However, such revisions and enjoinments are inconsequential in the disposition of these motions and therefore need not be discussed at length herein.

must be customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a)(1)-(3).

For a position to "requir[e] advanced knowledge" pursuant to 29 C.F.R. § 541.301(a)(1), such work must be "consistent [with an] exercise of discretion and judgment," as distinguished from the "performance of routine mental, manual, mechanical or physical work." 29 C.F.R. § 541.301(b). A "field of science or learning" pursuant to 29 C.F.R. § 541.301(a)(2) includes "the traditional professions of law, medicine, theology, accounting, actuarial computation, engineering, architecture, teaching, various types of physical, chemical and biological sciences, pharmacy and other similar occupations that have a recognized professional status as distinguished from the mechanical arts or skilled trades[.]" 29 C.F.R. § 541.301(c). "The phrase 'customarily acquired by a prolonged course of specialized instruction' restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession." 29 C.F.R. § 541.301(d).

The Third Circuit provided significant guidance on the application of the FLSA's learned professional exemption in *Pignataro v. Port Authority*, 595 F.3d 265 (3d Cir. 2010). The court in *Pignataro* held that helicopter pilots did not qualify for the learned professional exemption even though their position required substantial in-flight experience, because such skills were "acquired through experience and supervised training as opposed to intellectual, academic instruction." *Id.* at 270. Specifically, the court noted that "specialized instruction beyond a high school degree," "specialized knowledge," and "unique skills" are all insufficient to qualify an employee for the learned professional exemption. *Id; see also Reich v. Gateway Press, Inc.*, 13 F.3d 685, 698 (3d Cir. 1994) (holding that journalists do not qualify for the learned professional exemption despite the educational and practical requirements of performing such job).

18

Here, even when viewing the facts in a light most favorable to Defendant, it is unquestionable that AROs and REEs do not qualify for the learned professional exemption. Although AROs and REEs must pass an approved examination and complete various other continuing education requirements (ECF No. 73 ¶¶ 17-18; ECF No. 80 ¶¶ 17-18), Defendant has provided no evidence that AROs and REEs must complete any specific, intellectual or academic instruction. In fact, it is undisputed that two opt-in plaintiffs, Plaintiffs Shelley and Wooley, do not even hold bachelor's degrees. (ECF No. 73 ¶ 21, 23; ECF No. 80 ¶¶ 21, 23). At the time of his employment as an REE at BB&T, Plaintiff Wooley held only a Certified General Appraisal License. (ECF No. 73 ¶ 21; ECF No. 80 ¶¶ 23.) Moreover, in his Declaration, Plaintiff Wooley specifically noted "[t]o become a licensed appraiser, one need only complete the licensing requirements; one need not engage in any prolonged course of specialized intellectual instruction, such as obtaining a specific degree. For example, I do not hold a bachelor's degree." (ECF No. 30-6 ¶ 26.)

In support of its Motion for Summary Judgment on the applicability of the learned professional exemption, Defendant argues "the vast majority of the Plaintiff AROs and REEs required a prolonged, specialized education in appraising to fulfill their roles at BB&T, in that eleven (11) of the twelve (12) Plaintiffs held state appraisal certification/licenses." (ECF No. 71-1 at 30.) However, some "specialized instruction beyond a high school degree" is insufficient to qualify an employee for the learned professional exemption. *Pignataro*, 595 F.3d at 270. Appraisal certifications do not require extensive, academic instruction, as is evident from the fact that such certifications do not require higher education whatsoever. Rather, appraisal certifications are more akin to "skills acquired through experience and supervised training." *Id.*

Additionally, the fact that only eleven of the twelve Plaintiffs possess an appraiser license demonstrates that such licensure is not even mandatory for an ARO/REE position at BB&T.

Defendant cites *Pippins v. KPMG, LLP*, 759 F.3d 235, 244 (2d Cir. 2014), a Second Circuit decision holding that an accounting firm's accountants were exempt pursuant to the FLSA's learned professional exemption, in support of its contention that AROs and REEs qualify as professionally learned. Defendant's reliance on *Pippins* is misplaced. First, unlike real estate appraisal, accountancy is explicitly defined as an exempt profession in 29 C.F.R. § 541.301(c). Second, unlike AROs and REEs, certified accountants require a bachelor's degree as well as further and advanced academic study. Likewise, Defendant's reliance on *Owsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521 (5th Cir. 1999) and *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737 (6th Cir. 2000) is misplaced on similar grounds. Accordingly, Defendant is unable to satisfy the third prong of the test established in 29 C.F.R. § 541.301(a). As such, Defendant's Motion for Summary Judgment on the applicability of the learned professional exemption is **DENIED** and summary judgment is **GRANTED** to the Plaintiffs on this issue.[6]

### D.  Statute of Limitations

The FLSA imposes a two-year statute of limitations on exemption misclassification claims arising under the FLSA, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued[.]" 29 U.S.C. § 255(a). To

---

[6] Although the Plaintiffs did not formally move for summary judgment on the issue of the applicability of the FLSA's learned professional exemption (ECF No. 60-1), they did address the learned professional exemption in their Reply Brief to Defendant's Motion for Partial Summary Judgment, requesting that the Court "grant summary judgment [to it] on this exemption." (ECF No. 78 at 15.) The United States Supreme Court has held that "district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex*, 477 U.S. at 326. Here, it is clear that Defendant was on notice to come forward with its evidence, as Defendant first raised the issue in its own Motion for Partial Summary Judgment. (ECF No. 71-1 at 27-31.)

establish a "willful" violation, the plaintiff must demonstrate that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by [the FLSA.]" *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). "Acting only 'unreasonably' is insufficient [to demonstrate a willful violation] – some degree of actual awareness is necessary." *Souryavong v. Lackawanna County*, 872 F.3d 122, 126 (3d Cir. 2017) (quoting *McLaughlin*, 486 U.S. at 135 n.13). A finding of willfulness requires "a degree of egregiousness." *Souryavong*, 872 F.3d at 127. However, the Third Circuit has also held that "evident indifference toward the requirements imposed by the FLSA" is satisfactory to constitute a willful violation. *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1296 (3d Cir. 1991).

There are significant factual disputes concerning BB&T's exemption classification process precluding this Court from granting summary judgment to either party. The Plaintiffs presented evidence that Human Systems "simply thought it would be too costly" to classify AROs and REEs as nonexempt (ECF No. 80 ¶ 180; ECF No. 60-5 at 81, 128-129, 168; ECF No. 69-6). Conversely, Defendant highlights evidence that: the classification process was deliberate in that numerous lines of business managers were consulted prior to the classification (ECF No. 73 ¶ 182; ECF No. 71-14 at 54-55); Human Systems had managers complete questionnaires and "pull[] information regarding similar jobs in the marketplace" (ECF No. 73 ¶¶ 183-184; ECF No. 71-23; ECF No. 71-14 at 10-11); and BB&T hired someone it believed to be an expert on FLSA exemption, Cara Morris, to assist in its classifications. (ECF No. 73 ¶¶ 180-181). Additionally, there is an open question as to whether BB&T knew, or should have known, about the classification of Wells Fargo and JPMorgan Chase appraisers as nonexempt, the *Boyd* decision, and the DOL's February 25, 1986 Opinion Letter – all of which suggest that AROs and REEs should be classified as nonexempt. Accordingly, and for the reasons stated above, both summary

judgment motions concerning the applicable statute of limitations are **DENIED**.

### E. Liquidated Damages

Pursuant to 29 U.S.C. § 216, an employer who violates the FLSA's overtime provisions shall be liable for the employees' unpaid overtime wages plus "an additional equal amount as liquidated damages." A court may limit or deny liquidated damages if the employer demonstrates that it acted in "good faith" and "had reasonable grounds" to believe it was not in violation of the FLSA. 29 U.S.C. § 260. However, a "finding that the employer willfully violated the FLSA necessarily precludes the Court from finding that the employer acted in good faith." *Stillman v. Staples, Inc.*, 2009 WL 1437817, *22 (D.N.J. May 15, 2009). In order to demonstrate good faith and that it acted reasonably, an employer "must show that [it] took affirmative steps to ascertain the Act's requirements, but nonetheless, violated its provisions." *Martin*, 940 F.2d at 908.

Here, there remain substantial, material factual disputes surrounding BB&T's classification process. For the same reasons set forth in the discussion of the parties' motions concerning the applicable statute of limitations, both parties' summary judgment motions pertaining to liquidated damages are **DENIED**.

## VI. CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Partial Summary Judgment (ECF No. 60) is **GRANTED IN PART** and **DENIED IN PART** and Defendant's Motion for Partial Summary Judgment (ECF No. 71) is **DENIED**.


**Date:** September 28, 2018                    */s/ Brian R. Martinotti*
                                                **HON. BRIAN R. MARTINOTTI**
                                                **UNITED STATES DISTRICT JUDGE**